UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MICHAEL LYNN SHELTON )
)
V. ) NO. 2:16-CV-287
)
NANCY BERRYHILL, )
Acting Commissioner of Social Security )

**REPORT AND RECOMMENDATION**

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's claims for Disability Insurance Benefits and Supplemental Security Income were denied administratively by the defendant following a hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that final decision of the Commissioner. The plaintiff has filed a Motion for Judgment on the pleadings [Doc. 14], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 16].

**I.   Standard of Review**

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor

1

resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

## II. Sequential Evaluation Process

The applicable administrative regulations require the Commissioner to utilize a five-step sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant

numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

## III. Plaintiff's Vocational Characteristics

Plaintiff was born in 1973 and was a younger person under the applicable regulations at the time he filed his application. He alleges that he became disabled on September 12, 2012 (Tr. 33, 203, 210, 225). His insured status expired on December 31, 2014 (Tr. 257). Accordingly, he must establish disability on or before that date in order to be entitled to benefits. 20 C.F.R. § 404.130. Plaintiff had previously applied for disability benefits in November 2010, but was administratively denied on September 11, 2012 (Tr. 62-76). There is no dispute that he cannot return to his past relevant work as a cable installer, which was heavy work as he performed it, a driver, light exertion with a specific vocational preparation category of 4, plumber's helper, heavy as he performed it, and pipe fitter, heavy as he performed it.

## IV. Evidence in the Record

Plaintiff's medical history is accurately summarized in Defendant's brief as follows:

> On February 21, 2012, Plaintiff visited his primary care provider, Kristin Freeman, M.D. (Tr. 304). He reported: shortness of breath with dry cough, fatigue, and wheezing; moderate to severe neck and back pain; and severe epigastric reflux (Tr. 304). He also reported an improvement in anxiety symptoms with medication (Tr. 304). A physical examination showed a limping gait with a cane (Tr. 307). Plaintiff had tenderness in his cervical, thoracic, and lumbar spine, and no edema (Tr. 307). He appeared oriented with normal insight, normal judgment, and appropriate mood and affect (Tr. 307). He denied difficulty concentrating (Tr. 304). X-rays of his thoracic spine showed mild degenerative changes (Tr. 315).

X-rays of his lumbar spine showed minimal to mild degenerative changes in the lower lumbar spine (Tr. 317). X-rays of his cervical spine were normal (Tr. 319). Dr. Freeman advised Plaintiff to stop smoking cigarettes (Tr. 307). She refilled Plaintiff's medications and referred him for a bilateral lower extremity nerve conduction study (Tr. 307).

Pulmonary function tests on March 28, 2012 suggested an upper airway obstruction (Tr. 309). A nerve conduction study and EMG of the lower extremities was normal (Tr. 310-12).

Plaintiff returned to see Dr. Freeman for medication refills in May 2012 (Tr. 300). He reported stable anxiety with a good response to medication (Tr. 300). He stated that he spent three days in bed with a lumbosacral pain flare up a few weeks before (Tr. 300). A physical examination was unchanged (Tr. 302).

On January 23, 2013, Plaintiff visited Tihomir Tochev, M.D., to re-establish pain management care (Tr. 328). He last saw Dr. Tochev in January 2010 (Tr. 328). Plaintiff reported that he stopped taking his anxiety and pain medications (Tr. 328). He reported that his symptoms had been unbearable with constant pain preventing him from doing basic functions (Tr. 328). He was unable to sleep, to walk, or to enjoy life (Tr. 328). Plaintiff reported numbness and weakness in his legs and tenderness in his wrists (Tr. 328).

Upon examination, Plaintiff appeared to be in moderate distress, changing positions on the examination table (Tr. 329). He had no motor or sensory deficits (Tr. 329). He had diffuse tenderness and trigger point tenderness over his right wrist consistent with positive carpal tunnel sign (Tr. 329). His grip strength was significantly reduced on the right compared to the left (Tr. 329). His neck and shoulders appeared within normal limits with some tenderness between the shoulder blades (Tr. 329). Plaintiff had trigger point tenderness and areas of paravertebral muscle spasms over the lumbar spine (Tr. 329). He had a reduced range of lumbar motion with negative straight leg raises and no signs of radiculopathy (Tr. 329). Dr. Tochev prescribed oral pain and anxiety medication, and topical medication for Plaintiff's wrists (Tr. 330). He also recommended an EMG of the bilateral upper extremities (Tr. 327, 330).

Plaintiff returned to see Dr. Tochev for medication refills on February 21, 2013 (Tr. 326). Dr. Tochev reviewed Plaintiff's previous MRI scan findings and recommended a neurosurgery consultation (Tr. 326).

Two months later, in April 2013, Plaintiff reported a 50 percent improvement in symptoms control and no side effects from medications (Tr. 323). He also reported feeling very anxious and worried about financial and family issues (Tr. 323). Dr. Tochev noted that an MRI scan of Plaintiff's cervical spine from June 2011 showed a central disc extrusion causing mild to moderate central canal stenosis (Tr. 323). Dr. Tochev noted that this MRI did not easily explain Plaintiff's symptoms of neck, shoulder, and upper extremity pain and numbness (Tr. 323). A physical examination showed a well-developed, well-groomed male in no noticeable distress (Tr. 323). Plaintiff's responses to an anxiety scale showed mild anxiety with no severe depression (Tr. 323). Plaintiff had trigger-point tenderness in his cervical spine with muscle spasm and no visual abnormalities in range of motion (Tr. 323). Plaintiff had trigger point tenderness in the lumbar spine with

muscle spasms and SI joint tenderness (Tr. 323). Plaintiff rated his pain an average of 5 to 6 out of 10 (Tr. 324). Plaintiff reported that he was able to care for himself and his family (Tr. 324). He had an improved quality of life and no side effects from therapy (Tr. 324). Dr. Tochev noted that Plaintiff had achieved 50 percent pain control (Tr. 324).

On the same day, Dr. Tochev wrote a letter stating that, due to the complexity of Plaintiff's chronic medical condition, Plaintiff had limited rehabilitation potential and ability to maintain productive and gainful employment (Tr. 325). Plaintiff returned to see Dr. Tochev for medication refills on June 17, 2013 (Tr. 322). He complained of tendonitis in his left elbow (Tr. 322). Upon examination, Plaintiff had some tenderness in his left lateral elbow (Tr. 322).

On August 24, 2013, Plaintiff completed a Function Report indicating that he lived in a house with his two sons, ages 16 and 22 (Tr. 249). He stated that he had no grip strength and constant pain in his hands due to carpal tunnel (Tr. 249). He reported numbness in his legs and constant pain in his back, neck, and legs (Tr. 249). He stated that he could not sit or stand for too long at one time without numbness and pain (Tr. 249). He could not raise his arms to brush his hair (Tr. 250-51). He did very little cleaning and only made his bed (Tr. 251). He could drive and he shopped in the grocery store once a month (Tr. 252). His hobbies included reading and watching television (Tr. 253). He chatted on the computer a couple of times a week and visited his parole officer once a month (Tr. 253). He reported problems lifting, bending, standing, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, using his hands, and getting along with others (Tr. 254). He stated that he could lift only 20 pounds and stand for 20 minutes (Tr. 254). He used a cane when his sciatic nerve acted up and wrist braces every night (Tr. 255).

Plaintiff underwent a psychological evaluation with Chad R. Sims, Ph.D., a licensed clinical psychologist on September 24, 2013 (Tr. 338-46). He reported that he had been divorced since 2010 and lived with his two sons, both of whom were full-time students (Tr. 339). Plaintiff completed tenth grade and then dropped out because he had no interest in school (Tr. 339). He served seven months in prison for a 2010 vehicular assault charge and remained on probation through June 2014 (Tr. 340). He had never been hospitalized for mental health problems and never seen a mental health practitioner (Tr. 340). He received medication for anxiety and depression through his primary care provider (Tr. 340). He stated that Xanax and Zoloft were helpful in fighting off panic attacks to some degree (Tr. 340). He described his mood as "down in the dumps" and stated that he suffered with depression since his marriage ended (Tr. 340). He reported some social withdrawal (Tr. 340). He avoided his youngest son's school activities. (Tr. 341).

Plaintiff reported that he managed his medications with little or no difficulty (Tr. 345). In an average week, he had two good days and five bad days (Tr. 341). On good days, he played video games with his sons and sometimes had friends over to his home (Tr. 341). He could prepare simple meals and cook hamburgers and spaghetti (Tr. 345). He vacuumed on occasion and did laundry with negative effects on his back (Tr. 345). He did not do any yard work because of his back

pain (Tr. 345). He drove a car regularly, picking up his son from school or going to the grocery store when necessary (Tr. 345). He drove to the interview that day (Tr. 345). His hobbies included watching television and listening to music (Tr. 345).

Plaintiff displayed limited eye contact during the evaluation, and he reluctantly removed his sunglasses when asked (Tr. 341). He appeared tired and avoided eye contact (Tr. 341). His speech was slow but otherwise normal (Tr. 341). His responses lacked detail at times and his thought process included circumstantial thinking (Tr. 341). He appeared able to follow written and spoken instructions (Tr. 341). He showed good use of vocabulary and basic math skills (Tr. 341). He showed a fair capacity for abstract thinking and understanding (Tr. 341). He did not appear significantly distractible and displayed adequate persistence during psychological testing (Tr. 344). He displayed some degree of psychomotor slowing on some tasks, consistent with his report of depressed mood (Tr. 344). His general cognitive abilities fell in the average range (Tr. 344). His ability to sustain attention and concentration fell in the low average range (Tr. 344). Plaintiff appeared to have average intellectual functioning with evidence of a mild impairment in short-term memory (Tr. 346). He showed evidence of a mild impairment in his ability to sustain concentration (Tr. 346). He showed moderate impairment in social relating and a mild impairment in his ability to adapt to change (Tr. 346). He appeared able to follow instructions and handle his own finances (Tr. 346).

On October 2, 2013, George Livingston, Ph.D., a state agency psychological consultant, reviewed the record and opined that Plaintiff's affective disorder and anxiety-related disorder resulted in no more than: moderate restrictions of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 87). Dr. Livingston indicated that Plaintiff could do simple and low to medium level detailed tasks with normal supervision and breaks (Tr. 92). He found that Plaintiff would adapt best in small group settings with occasional contact with the public (Tr. 92).

On October 17, 2013, Plaintiff attended a physical examination with Jonathan Wireman, M.D. (Tr. 347-50). Plaintiff reported that he injured his neck and back in a motor vehicle accident in 2010 (Tr. 347). He received a cane to use but did not have it with him at the examination (Tr. 347). He also reported carpal tunnel in his hands and wrists since 2006 (Tr. 347). Plaintiff smoked one half to three and a half packs of cigarettes a day for 25 years (Tr. 348). Upon examination, Plaintiff exhibited a somewhat odd affect and fair cooperation (Tr. 349). He had a normal gait and station and did not use a cane or assistive device (Tr. 349). He displayed normal tandem walking, normal heel and toe standing, normal right and left leg standing, and normal squatting (Tr. 349). He exerted normal effort getting on and off the examination table (Tr. 349). He had a normal range of motion in his neck, shoulders, elbows, wrists, and hands, hips, knees, and ankles (Tr. 349). He had negative Tinel's and Phalen sign, and 5/5 grip strength (Tr. 349). He had a reduced range of lumbar motion and negative straight leg raises (Tr. 349). He had intact sensation with decreased sensation in the left fourth and fifth fingers

6

(Tr. 349). He had 5/5 strength throughout (Tr. 349). Following the examination and review of 2013 primary care and pain management notes, Dr. Wireman opined that Plaintiff could lift 10 pounds frequently and 30 pounds occasionally, stand or walk for 6 hours, and sit for 6 hours with frequent position changes and reasonable breaks (Tr. 350).

On October 28, 2013, Kanika Chaudhuri, M.D., a state agency medical consultant, reviewed the record and opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently (Tr. 89). Dr. Chaudhuri found that Plaintiff could sit about six hours in an eight-hour day, and stand or walk for about six hours in an eight-hour day (Tr. 89). He could frequently balance, stoop, crouch, and climb stairs or ramps, and occasionally kneel, crawl, and climb ladders, ropes, or scaffolds (Tr. 89).

In a Function Report dated February 1, 2014, Plaintiff stated that he could not sit or stand longer than 15 minutes (Tr. 267). He reported constant pain in his wrists and numbness in his legs (Tr. 267). He had anxiety and panic attacks that limited the time he spent away from home (Tr. 267). He said that he often stayed in bed because of chronic depression (Tr. 267). In a typical day, he tried to clean but was limited by pain and reported that he could not accomplish much (Tr. 268). He stated that his mother did the housework for him (Tr. 268-69). He watched television and read (Tr. 271). He seldom left the house and had no friends (Tr. 272). He stated that his medications upset his stomach (Tr. 274).

On February 24, 2014, Jayne Dubois, Ph.D., a state agency psychological consultant reviewed the record and opined that Plaintiff had no more than moderate restrictions of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 121). She indicated that Plaintiff could do simple and low to medium level detailed tasks with normal supervision and breaks (Tr. 127). She found that Plaintiff would adapt best in small-group settings with occasional contact with the public (Tr. 127).

On March 4, 2014, Frank Pennington, M.D., a state agency medical consultant, reviewed the record and opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently (Tr. 123). Dr. Pennington found that Plaintiff could sit about six hours in an eight-hour day, and stand or walk for about six hours in an eight-hour day (Tr. 124). He could frequently balance, stoop, crouch, crawl, and climb stairs or ramps, and occasionally kneel and climb ladders, ropes, or scaffolds (Tr. 89).

Plaintiff returned to his primary care provider on May 22, 2014, with complaints of gastric reflux, sores of his head, anxiety, back pain, and shortness of breath (Tr. 370). Plaintiff reported that he could complete community errands, complete cooking activities, style his hair, tuck in his shirt, and wash his back and hair (Tr. 370). He could also climb stairs, exercise, and walk 10 blocks (Tr. 370). A physical examination showed no lumbar spine tenderness, normal mobility, and intact sensation (Tr. 372). Plaintiff had normal insight, normal judgment, and appropriate mood and affect (Tr. 372).

The following month, on June 2, 2014, Plaintiff's primary care provider ordered pulmonary function tests (Tr. 375).

7

On August 7, 2014, Plaintiff visited Dr. Tochev for medication management (Tr. 386). He had no acute complaints and no side effects from treatment (Tr. 386). Plaintiff returned to see Dr. Tochev for medication refills on October 8, 2014 (Tr. 385). He appeared stable with complaints of some allergy symptoms (Tr. 385).

Two days later, on October 10, 2014, Plaintiff visited Tarandeep Kaur, M.D., to establish a new primary care provider (Tr. 395). He reported a history of back pain, anxiety, and sinus problems (Tr. 395). He rated his pain a 7 out of 10 (Tr. 395). He also reported significant anxiety relief with medication (Tr. 395). Upon examination, Plaintiff had a decreased range of motion in his right hip with normal strength and no tenderness (Tr. 397). He had a decreased range of motion, tenderness, and spasm in his lumbar spine (Tr. 397). Dr. Kaur ordered an MRI scan of his lumbar spine (Tr. 398).

Plaintiff returned to see Dr. Tochev on November 6, 2014 (Tr. 384). Plaintiff rated his average pain level a 5 to 6 out of 10 (Tr. 382). He stated that 50 percent of his pain was relieved with medication (Tr. 382). He indicated that the pain relief made a real difference in his life (Tr. 382). Plaintiff reported mild constipation and fatigue from his medications (Tr. 383). Plaintiff received medication refills in January 2015 (Tr. 381). On April 29, 2015, Plaintiff returned to see Dr. Tochev with complaints of swelling and shooting pain in his arm and hand (Tr. 380). Dr. Tochev advised Plaintiff to use his topical gel three times a day (Tr. 380).

On May 5, 2015, Plaintiff visited his new primary care provider, Dr. Kaur (Tr. 390). He rated his back pain a 5 out of 10 with medication (Tr. 390). An MRI scan of lumbar spine on May 15, 2015 showed disc desiccation at L3-4 and L5-S1, and a new disc extrusion posteriorly at L1-L2 level with a moderate mass affect upon the anterior aspect of the thecal sac (Tr. 400).

On May 28, 2015, Dr. Tochev completed a medical source statement indicating that he saw Plaintiff every two to three months (Tr. 402). Dr. Tochev stated that prolonged standing, sitting, and walking for 30 to 60 minutes was very difficult for Plaintiff due to pain in his lower back, neck, and arms (Tr. 402). He opined that Plaintiff could never lift and carry more than five pounds (Tr. 402).

On the same day, May 28, 2015, Plaintiff testified at an administrative hearing (Tr. 34-51). He stated that he last worked as a self-employed transportation provider, driving patients from their homes to their doctor appointments (Tr. 34). He previously worked as a cable installer, a city maintenance worker, a plumber's assistant, and pipefitter (Tr. 35). He had not worked since a car accident in April 2010 (Tr. 36). He broke two ribs and vertebrae, and dislocated a hip in the car accident (Tr. 37). His doctor recommended surgery but he decided against it (Tr. 37). He had two months of rehab and took pain medication (Tr. 37-38). He could not do any exercises or stretching (Tr. 38).

Plaintiff testified that pain radiated from the bulging disc in his neck midway down his back (Tr. 38). He also had a herniated disc in his low back and numbness in his legs from sitting for long periods (Tr. 38). He reported that he could not sit in a car for eight hours a day (Tr. 36). He also had a 15-year history of carpal tunnel that had gotten worse (Tr. 36-37). Plaintiff said he could sit for 15 to 20 minutes at a time and then need to walk it off (Tr. 39). He spent 75 percent

of his time lying in bed, in a recliner, or on the couch (Tr. 39-40). The heaviest thing he could lift was a gallon of milk (Tr. 39). He could stand or walk for about 10 to 15 minutes at a time (Tr. 41). His pain medication helped to a point but did not take the pain away (Tr. 42). His combination of medications made him tired and fatigued (Tr. 43-44). Plaintiff further reported a history of anxiety and panic attacks for as long as he could remember (Tr. 44). He said he did not leave the house other than for a doctor's appointment (Tr. 45). He did not go to the grocery store or do any shopping (Tr. 45). He did not do any household chores and could no longer work on cars (Tr. 49). He had pain radiated down his leg when sitting and diminished grip strength (Tr. 48, 50-51). He would only drive to doctor appointments if his mom or fiancée could not take him (Tr. 49).

A vocational expert testified that a hypothetical person with limitations described the ALJ could perform light, unskilled work as a ticket clerk, cashier, and mail sorter (Tr. 54). The vocational expert stated that her testimony was consistent with the Dictionary of Occupational Titles (Tr. 55).

Plaintiff's mother testified that Plaintiff was not able to tend to his two boys or go to the high school and sit through shows (Tr. 57). She said that Plaintiff could not do much of anything and mostly stayed in bed (Tr. 57). She had seen him fall several times because his legs gave out (Tr. 57). He also had trouble with his arms and could not lift a whole lot (Tr. 58). She testified that Plaintiff had problems for about 10 years and he worked for as long as he could (Tr. 59). She stated that it had been years since Plaintiff went out for a family celebration (Tr. 60).

Plaintiff's father wrote a letter dated May 28, 2015, stating that Plaintiff could no longer help around the house, mow the yard, or work on his car (Tr. 296). He stated that Plaintiff was in constant pain (Tr. 296).

Plaintiff's oldest son wrote a letter stating that Plaintiff had not been the same since his accident (Tr. 297). He said that Plaintiff was nowhere near as active as he once was (Tr. 297). He stated that Plaintiff had not taken him fishing since the accident and Plaintiff was barely able to leave the house (Tr. 297). He said Plaintiff could barely drive because of pain (Tr. 297).

Plaintiff's youngest son also wrote a letter stating that Plaintiff could not mow or work on his cars since he broke his back (Tr. 298). He said that Plaintiff never felt good and could not come to his school concerts because he could not sit long enough to listen and being around all the people made him panicky (Tr. 298).

[Doc. 17, pg. 2-13].

## V.  The ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through December 31, 2014 and had not engaged in substantial gainful activity since September 12, 2012, the alleged onset date of Plaintiff's disability (Tr. 11). The ALJ found Plaintiff had severe

9

impairments of degenerative disc disease, asthma, and depressive disorder. (Tr. 11). He found that Plaintiff's carpal tunnel syndrome, sciatica, anxiety and panic attacks did not pose significant limitations in his functioning and were non-severe (Tr. 18).

The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpt. P, App'x 1 (20 C.F.R. § 404.1520(d), 416.920(d)). In making this finding, the ALJ found Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04 as his impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation. He noted that Plaintiff had no restrictions in activities of daily living, observing Plaintiff can "prepare simple meals, go grocery shopping, drives regularly to pick up his son, vacuum, do laundry, watch television, and care [for] his personal needs." (Tr. 18). He found Plaintiff only had "mild limitation in social functioning" and moderate difficulties regarding concentration, persistence and pace (Tr. 18). Thus, the Listings were not satisfied.

The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work involving simple and routine job or job tasks, except with no exposure to excessive dust, fumes, chemicals, or temperature extremes (Tr. 19). In making this assessment, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.

Regarding Plaintiff's back problems, the ALJ noted that the objective medical evidence supported the diagnosis of degenerative disc disease (Tr. 20). While this diagnosis supported "some limitations" the ALJ determined that it did not "support the degree of limitations" alleged by Plaintiff (Tr. 20). He noted that even though he claimed he suffered from sciatica, Dr. Pendola found the nerve conduction study and the EMG exam of Plaintiff's legs to be normal (Tr. 20). He also found, as previously noted, Plaintiff's carpal tunnel syndrome to be non-severe as the "record does not contain diagnostic testing or studies confirming the allegation." (Tr. 20).

Regarding Plaintiff's mental impairments, he found the effect of his depressive disorder limited Plaintiff to "simple routine jobs and job tasks." (Tr. 20). His anxiety was considered non-severe.

Concerning Plaintiff's allegations of disabling pain, the ALJ found that the medical determinable impairments would limit Plaintiff to the performance of light work. In making that assessment, the ALJ evaluated Plaintiff's daily activities such as "going grocery shopping, chatting only, reading, watching television, caring for [his] personal needs…." (Tr. 21). The ALJ found that Plaintiff's "description of the symptoms and limitations that the [Plaintiff] has provided throughout the record has generally been inconsistent and unpersuasive." (Tr. 21). He found that Plaintiff's allegation of disabling pain and other symptoms not credible or supported by the documentary evidence. (Tr. 21).

The ALJ gave "some weight" to the opinion of Dr. Wireman, who found Plaintiff could lift 10 lbs. frequently and 30 lbs. occasionally, stand or walk for six hours in an eight-hour work day and sit for six hours in an eight-hour work day. He noted, however, that

Plaintiff "may not be able to lift 30 pounds occasionally" but could engage in certain daily activities.

He gave "little weight" to the opinion of Dr. Tochev. He considered Dr. Tochev's opinion dated April 2013 and May 2015. Dr. Tochev's opinion in April 2013 was that Plaintiff had "limited rehabilitation potential and ability to maintain productive and gainful employment." (Tr. 21). Dr. Tochev's May 2015 opinion was that Plaintiff could never lift or carry five pounds or greater and rarely lift or carry less than five pounds. (Tr. 21). The ALJ found that Dr. Tochev, in coming to his opinions, "relied quite heavily on the subjective report of symptoms and limitations provided by the [Plaintiff], and seemed to uncritically accept as true most, if not all, of what the [Plaintiff] reported." (Tr. 21).[1]

The ALJ gave "some weight" to Dr. Sims' opinion, who opined that Plaintiff had mild impairment in ability to sustain concentration. Instead, the ALJ found Plaintiff had moderate impairment in the area of functioning, based on the Plaintiff's depressive disorder. (Tr. 21). He noted no more than mild impairment in the area of social relating, basing that on Plaintiff's chatting online with others.

The ALJ gave the State agency psychological consultants "some weight" in limiting Plaintiff to simple and routine jobs or job tasks, but not otherwise (Tr. 23). He found no

---

[1] The ALJ noted that the reason for this might be because Dr. Tochev wanted "to assist a patient with whom he … sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (Tr. 21).

12

significant limitations in Plaintiff's social functioning. He gave "little weight" to the State agency medical consultants, finding that Plaintiff's degenerative disc disease "results in pain and restricts [him] to light exertion (lifting and/or carrying 20 pounds occasionally and 10 pounds frequently)." (Tr. 23).

The ALJ found that Plaintiff had a high school education by way of a general education diploma, that transferability of skills was not an issue, and that considering Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs in the national economy which Plaintiff could perform. The ALJ found that the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App'x 2 could not be utilized because Plaintiff's ability to perform a full range of light work was limited by nonexertional limitations. He posed a hypothetical to the VE based on the determined RFC. The VE testified that Plaintiff could perform occupations such as ticket clerk, 3,400 jobs in Tennessee and 87,000 nationwide; cashier, 25,000 jobs in Tennessee and 551,000 jobs nationwide; mail sorter, 1,100 jobs in Tennessee and 72,000 jobs nationwide. Accordingly, the ALJ found Plaintiff not disabled (Tr. 24).

## VI. Plaintiff's Assertions of Error and Analysis

Plaintiff's first argument is that the ALJ failed to state what weight he gave to Dr. Tochev, Plaintiff's treating physician. [Doc. 15, pg. 14]. This issue is easily resolved by examining the ALJ's analysis of Dr. Tochev's opinion. The ALJ provided a detailed analysis of what he considered in analyzing this opinion. At the end of this discussion, the ALJ concluded that "these assessments are given little weight." (Tr. 21). It is readily apparent that what the ALJ was referring to in this description was Dr. Tochev's opinion

regarding Plaintiff's ability to only lift less than five pounds. Thus, this issue is without merit.

The second issue, and more substantive one, is the ALJ's treatment of Dr. Tochev's opinion. Plaintiff argues that the ALJ failed to give "good reasons" for not giving his opinion controlling weight as a treating physician. To be sure, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Thus, an ALJ must give controlling weight to a treating source if the ALJ finds that opinion well-supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Closely associated with the treating physician rule is the requirement that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). The ALJ's decision

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996); see also *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). When the ALJ declines to give controlling weight to a treating physician's assessment, "the ALJ must still determine how much weight is appropriate by considering

a number of factors, including the length of treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406; see also 20 C.F.R. § 404.1527(c).

First, the ALJ properly gave little weight to Dr. Tochev's April 2013 opinion that Plaintiff had limited ability to maintain gainful employment. That issue is reserved for the Commissioner, and this aspect of Dr. Tochev's opinion was not entitled to any weight. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. See 20 C.F.R. § 404.1527(d).

Second, but more problematic, is the ALJ's treatment of Dr. Tochev's opinion that that Plaintiff could only lift 5 pounds based on the objective medical evidence of "central disc extrusion C3-C4, cervical spine stenosis, disc bulge T5-6, post-traumatic rib fractures, hip dislocation, left transverse process fracture spine, disc degeneration." (Tr. 402).

The reason the ALJ gave in support of his decision to discount Dr. Tochev's opinion seemed to be based primarily on his assessment of Plaintiff's credibility. He noted that Dr. Tochev's opinion was based on Plaintiff's allegations, which he found not to be credible. Thus, he concluded that he could give Dr. Tochev's opinion little weight. For example, the ALJ stated that "[t]he doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported." (Tr. 21). The ALJ cynically concluded that "patients can be quite insistent and demanding in seeking supportive notes or reports from

15

their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension." (Tr. 21). The ALJ admits that it is "difficult" to prove such motives, but he believed it existed because Dr. Tochev's opinion "departs substantially from the rest of the evidence of record…." (Tr. 21). But that is simply not the case. The ALJ acknowledged objective medical evidence existed to support the symptoms claimed by Plaintiff. Indeed, this was not a case where Plaintiff came in complaining of pain without any objective medical support. After all, Plaintiff has degenerative disc disease, which the ALJ found to be a severe impairment.

Dr. Tochev is a treating physician. The Court agrees with Plaintiff that the ALJ erred in discounting Dr. Tochev's opinion without an adequate explanation. Initially, the Court makes the observation that the ALJ failed to mention the "controlling weight" analysis. While the ALJ noted that Dr. Tochev's limitations were "too restrictive and inconsistent with other substantial medical evidence of record," (Tr. 21), that consideration is a relevant factor to both steps of the treating physician analysis. *See* 20 C.F.R. § 404.1527(c)(2). But without any explanation by the ALJ--or even any mention of the concept of controlling weight--it is unclear to the Court whether the ALJ undertook the "two-step inquiry" required when analyzing treating source opinions. This lack of explanation "hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013)(referencing 20 C.F.R. § 404.1527(c)(2)).

Based on the foregoing, this Court finds that the ALJ failed to conduct and meaningfully explain the required treating physician analysis when assessing Dr. Tochev's

opinion. Accordingly, the ALJ's non-disability finding must be reversed. See *Blakley,* 581 F.3d at 409-10 (holding that "the Commissioner must follow his own procedural regulations in crediting medical opinions").

In this case, the evidence of disability is not overwhelming as there are conflicting medical opinions in the record regarding Plaintiff's physical limitations. The Court concludes that a remand for further explanation is necessary and should occur. On remand, the ALJ should adequately explain why he discounted Dr. Tochev's opinion consistent with the regulations promulgated by the Commissioner.

## VII. Conclusion

The Court RECOMMENDS that Plaintiff's motion on the pleadings [Doc. 14] be GRANTED and the Commissioner's motion for summary judgment [Doc. 16] be DENIED for the reasons stated herein. The Court RECOMMENDS that the case be REMANDED consistent with sentence four of 42 U.S.C. § 405(g) for further evaluation.[2]

                                                  Respectfully Submitted,

                                                  s/ Clifton L. Corker
                                                  United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).